IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DESHAUN STATEN,

                Plaintiff,                OPINION AND ORDER

v.

                                                  20-cv-227-wmc

STACEY HOEM,

                Defendant.

*Pro se* plaintiff Deshawn Staten suffers from severe mental health challenges, and he filed this lawsuit claiming that health unit staff mishandled his medical needs in 2019 while he was incarcerated at the Wisconsin Secure Program Facility ("WSPF").[1] Ultimately, the court granted Staten leave to proceed under the Eighth Amendment and Wisconsin law against a psychologist working at WSPF, Dr. Stacey Hoem, for failing to properly address his mental health needs in September of 2019, when he was facing a mental health crisis. Now before the court is Dr. Hoem's motion for summary judgment. (Dkt. #34.) Because the undisputed evidence of record at summary judgment does not permit a reasonable trier of fact to conclude that Dr. Hoem consciously disregarded Staten's need for mental health treatment or the risk that he might commit severe self-harm, the court will grant defendant's motion on the merits of Staten's Eighth Amendment claim, relinquish supplemental jurisdiction over his state-law claim, and direct entry of final judgment.

---

[1] Staten is currently incarcerated at the Green Bay Correctional Institution.

UNDISPUTED FACTS[2]

Deshawn Staten was incarcerated at WSPF in September of 2019, where Dr. Hoem worked as a psychologist in the Psychological Services Unit ("PSU"). Dr. Hoem has a doctorate in clinical psychology, and she began seeing as Staten as his assigned clinician at WSPF in September 2019.

Among other mental health issues, Staten has been diagnosed with an antisocial personality disorder. Since his incarceration began at WSPF, Staten has been placed on clinician observation status multiple times for self-harming behaviors, often for extended periods of time. Staten's typical self-harm consists of banging his head or cutting. Staten also has a history of hunger strikes. Staten's PSU records include entries interpreting these behaviors as "manipulative and motived by secondary gain." (*See, e.g.*, Ex. 1000 (dkt. #31-1) 2.)

On September 20, 2019, the Wisconsin Department of Justice notified the PSU that Staten had written to this court regarding his thoughts of self-harm. That day at 9:30 a.m., Dr. Hoem saw Staten at his cell front. Among other things, she asked if Staten was having any thoughts of self-harm, or whether he intended to harm himself as reported. At that time, however, Staten denied any thoughts of self-harm or intent to harm himself. In addition to addressing Staten's communication to the court, Dr. Hoem asked Staten about a recent communication that he had sent to WSPF's health services unit ("HSU")

---

[2] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

2

threatening to stop eating and drinking, as well as refusing to have lab work done. Specifically, while Staten had threatened to stop drinking liquids, he reported to Dr. Hoem that he had drunk Boost and eaten all his food the night before, except for his vegetables. Although Staten refused breakfast that morning, he usually did not take that meal. Staten also reported that lab work was against his religion as a Jehovah's Witness (although he later referred to being Muslim).

As reflected in her contemporaneous notes, Dr. Hoem's impressions of Staten on September 20 were that: he did not show overt signs of anxiety or mania; he was calm and maintained eye contact; and his attention was intact. Dr. Hoem also noted that Staten neither appeared to be responding to internal stimuli, nor was he having difficulty tracking their conversation. As a result, Dr. Hoem recommended that Staten remain on clinical monitoring, with his mental health needs continuing to be monitored.

Later on September 20, however, security staff reported to PSU that Staten had started threatening self-harm and banged his head after being told that he would be moving to another cell and would not have his TV. In response, Dr. Hoem directed that Staten be placed in "clinical observation status," a non-punitive status used for temporary confinement of an inmate to ensure the safety of inmates or others.

An inmate may be placed on clinical observation due to mental illness, or when not mentally ill but posing a danger to himself. An inmate who reports thoughts of, or a plan to, commit suicide or self-harm are nearly always placed in clinical observation status. The property an inmate may receive or retain in that status is defined by a clinician to minimize the inmate's risk of harm. Inmates on clinical observation are also checked on by unit staff

3

members at least every 15 minutes. In addition, PSU staff are to evaluate them regularly -- by reviewing logs and from cell front evaluations -- to determine whether they should remain on clinical observation status. Each clinical observation placement is to be handled based on the circumstances of the individual inmate, the inmate's presentation and the clinician involved.

Dr. Hoem explains that when assessing an inmate to determine if they can be released from clinical observation, she considers: the inmate's emotional state, level of agitation and cooperation with the PSU assessment; whether the inmate is future-oriented; what the inmate reports regarding thoughts of self-harm; and the triggers that led to the inmate's mental state and coping strategies. Dr. Hoem also reviews observation logs and speaks with unit staff about the assessment.

When Staten was placed on clinical observation, he was authorized to possess suicide resistant clothes (a kilt), a security mat, toilet paper, bag meals, and soap when requested. At 3:30 p.m. on September 20, Dr. Hoem saw Staten at his cell front. Staten described the chain of events leading to his self-harm, stated that the judge he wrote to would be upset about how staff handled his self-harm, threatened to bite a hole in his arm if he were released from observation, expressed his intent to stay on observation status for a year, and stated that Dr. Hoem would see something she had never seen before. At that time, Dr. Hoem further observed Staten's mental state, noting that his attention was intact and there were no signs or complaints of sensory disturbance.

As a result, Dr. Hoem decided to continue Staten's placement on observation because (1) he stated an intent to harm himself if released from that status, and (2) in Dr.

Hoem's view, keeping him on clinical observation status assured close monitoring by staff and reduced the risk of self-harm. However, at the time, Dr. Hoem did not believe that there was an imminent risk of Staten committing suicide, such that a more restrictive setting was appropriate.

The next day, September 21, Dr. Hoem visited Staten and observed that he had engaged in minor self-injury earlier that day and had agreed to stop. Staten received a smock in place of a kilt, and Dr. Hoem recorded that Staten was cooperative during their brief interaction. The day after that, September 22, 2019, Staten told staff he was harming himself with an "item," although camera footage captured Staten using his thumb nail to attempt self-harm. Regardless, a security team entered Staten's cell, removed him, and placed him in a different observation cell, so that staff could search for a foreign object. Staff did not find an object in Staten's cell.

The next day, September 23, Staten attempted self-harm again. This time he removed his name plate magnet and metal, then held his trap door open and threatened to harm himself if he was not placed in a restraint bed. Non-defendants, Dr. Heather Schwenn and the Health Service Manager ("HSM") Adams, next told Staten that if he were placed in restraints, he would not be able to attend an upcoming physical therapy appointment for which he was waiting. While Staten told HSM Adams that he wanted to go to physical therapy, Staten later told Dr. Schwenn that he wanted to be placed in restraints. When Dr. Schwenn and Adams reapproached Staten, he told them both that he did *not* intend to commit self-harm and did *not* want to be placed in restraints. Still, because Staten had changed his mind, had held his trap door, and used a metal object to

threaten self-harm, Dr. Schwenn ordered Staten placed in a restraint bed. Several hours later, however, after Dr. Schwenn met with Staten, he determined Staten would not engage in self-harm again, and released him from the bed restraints -- although he was still on clinical observation.

The next day, the 24th, because Staten told Dr. Schwenn that he was still suicidal but refused to engage further with Dr. Schwenn, Staten remained on clinical observation status. On September 25, however, Staten told Dr. Schwenn and HSM Adams that he wished to participate in psychological programming and resume weekly meetings. Staten also agreed to start eating, drinking and working on his negative behavior. Dr. Schwenn then cautiously noted that Staten was moving in the right direction, but should remain on clinical observation. The very next day, the 25th, however, Staten reported to another PSU staff member that he was suicidal and upset because he was being denied certain programming. Staten also said that he wanted to stay on clinical observation and would engage in self-harm if removed. As a result, that staff member decided he should remain on clinical observation.

On September 27, 2019, one week after his placement in clinical observation, Dr. Schwenn asked that Staten be moved to a different cell with a mat glued down because Staten was using his mattress to hide from staff. On October 1, Staten reported to PSU staff feeling depressed and an intent to stay on observation until he spoke with Dr. Hoem. During this period, Staten also refused to meet with Dr. Schwenn on three, separate occasions.

On October 4, Dr. Hoem next met with Staten in a program group room to determine whether his placement should change.  Because Staten was not eating or drinking at the time, health services staff were present to administer an IV for hydration.  Among other things at that time, Staten spoke with Dr. Hoem about how he disliked staff and intended to harm them if given the chance.  Staten also told Hoem that he did not mind being in restrictive housing, nor did he care about getting more time in prison.  As a result, Dr. Hoem's written impression on October 4 was that Staten was alert, oriented and maintained eye contact; he was also very involved in the conversation and smiled at one point, showing no signs of complaints or sensory disturbance.  Hoem further noted that Staten was future-oriented about working with PSU, going to a group, and wanting to participate in outside recreation and to earn a TV.  Finally, Staten denied an intent to harm himself if released from observation.

Given her discussion with and impression of Staten, Dr. Hoem released him from clinical observation that same day, October 4, 2019.  After his release from observation, Staten was seen at his cell front and appeared in high spirits.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If there is any genuine issue as to any material fact, the court cannot grant summary judgment.  *Id*.  A dispute is genuine "if the evidence is such that a

7

reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

The Eighth Amendment prohibits prison officials from responding with "deliberate indifference" to a "substantial risk of serious harm" to his health or safety. *Id.* at 836. Moreover, significant self-harm constitutes "serious harm." *See Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). Thus, deliberate indifference to a risk of self-harm is present when an official is subjectively "aware of the significant likelihood that an inmate may imminently" harm himself, yet "fail[s] to take reasonable steps to prevent the inmate from performing the act." *Pittman ex* rel*. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014) (citations omitted); *see also Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").

The Eighth Amendment also recognizes a prisoner's right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976), which includes a right to appropriate mental health treatment. *Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical need is "serious" if it: so obviously requires treatment that even a lay person

8

could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). "Deliberate indifference" is an even higher standard; it means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference requires *more than* negligence, or even gross negligence, but requires something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

In this case, defendant Hoem seeks summary judgment because (1) Staten did not present with a serious medical need; (2) Dr. Hoem did not consciously disregard a risk that Staten might commit serious self-harm; and (3) Staten did not suffer a cognizable injury. Based on the record before the court at summary judgment, a reasonable jury would have to find in favor of defendant on all three grounds.

I.  **Serious medical need and cognizable injury**

The defendant argues that a reasonable jury would have to find that Staten neither posed a serious threat to himself, nor did he have a serious medical need or cognizable injury because his self-harm was superficial. In particular, defendant points as support to the Seventh Circuit's decision in *Lord v. Beahm*, 952 F.3d 902 (7th Cir. 2020), finding that an inmate could not sustain a claim against officers who failed to prevent him from self-inflicted injuries consisting of minor scratches that were treated with a gauze bandage. In

particular, the court held that the plaintiff's insincere threats of self-harm did not support an Eighth Amendment claim, rejecting plaintiff's argument that defendants response to a general "risk to his life" was "not compensable without evidence of injury," as opposed to the injuries he actually suffered. *Id.* at 905. In a subsequent unpublished opinion involving similar facts to Staten's, the Seventh Circuit similarly affirmed dismissal of claims against three psychologists who declined to order the plaintiff restrained, even though he was threatening self-harm. *See Douglas v. Schwartz-Oscar*, No. 20-3489, 2021 WL 6102971, at *2 (7th Cir. Dec. 22, 2021). In appealing the dismissal of his claims at summary judgment, the plaintiff argued that the district court minimized his self-harm injuries, but the Seventh Circuit affirmed, citing *Lord* and finding that the record revealed only "minor cuts and scratches treatable with band-aids and cream." *Id.* This same principle dooms Staten's claim here.

Specifically, on September 20, Staten banged his head against a wall, but he did not seek out or receive medical attention for any injuries from that self-harm. There is also a record of Staten scratching himself after Dr. Hoem met with him and declined to place him in restraints. Although a nurse examined Staten for the scratches, there is no dispute that the scratches were superficial, and there is no suggestion from the record that Staten even required medical attention. Rather, the nurse examined him *not* because of any injury from self-harm, but because chemical spray had been used during his transport to a different cell. More generally, there is *no* record that Staten required medical attention for the scratches or suffered *any* notable pain from the scratches. On this record, no reasonable

jury could conclude that Staten had a serious medical need or posed a substantial risk of harm to himself.

Plaintiff's primary argument in opposition fails as well. Indeed, Staten did not even respond to defendant's proposed findings of fact regarding the superficial nature of any injury. Instead, he submits one proposed finding of fact of his own, asking that the court review video footage of the cell extraction team removing him from his cell. (*See* dkt. #38.) The court infers that Staten intends to show that he was handled roughly during this extraction, but even if admissible, it has nothing to do with any claim against the defendant, Dr. Hoem, nor does Staten attempt to summarize: what the footage would show; whether he suffered pain or injury because of the cell extraction; or draw a connection between Dr. Hoem's failure to order him placed in restraints and any harm he suffered during the extraction.

The court is not required to "scour the record" in search of evidence to support plaintiff's claims. *Greer v. Bd. of Educ. of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) (citation omitted). Still, in fairness it is worth noting that Staten's arguments in this case do not change the analysis. In his amended complaint, Staten alleged that he was able to cut himself once he was placed on clinical observation status, but he never details his injuries; nor does plaintiff allege that he was left in severe pain. (*See* dkt. #15, at 3-11.) Rather, like the plaintiffs in *Lord* and *Douglas*, Staten wishes to be compensated solely for Dr. Hoem's failure to act on the risk that he would self-harm if not restrained. Accordingly, the defendant is entitled to summary judgment for lack of evidence of any serious medical need.

## II.     Deliberate indifference

To the extent the objective element of the Eighth Amendment claim were a close call, defendant is also entitled to summary judgment because she did not consciously disregard Staten's mental health needs nor unreasonable risk that he might commit severe self-harm. To the contrary, decisions by psychologists like Dr. Hoem are entitled to substantial deference.

"A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)) (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). However, the trier of fact must look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). "Several circumstances can permit a jury to reasonably infer deliberate indifference, such as denial of medical treatment altogether, delay of medical care, continued ineffective treatment, a substantial departure from accepted professional judgment, practice or standards, ignoring an obvious risk, and refusing care because of cost." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citations omitted). Here, none of these circumstances even arguably exist.

In fact, the undisputed record establishes that Dr. Hoem exercised medical judgment before declining to place Staten in restraints, and *no* evidence suggests that she ignored any clear medical need. Rather, Dr. Hoem met with Staten and assessed his behavior and demeanor twice on September 20 and again on September 21. Based on her

professional opinion, Staten's placement in clinical observation -- with limited property and regular monitoring -- adequately addressed his mental health needs, as well as the risk that he posed to himself.  In declining to order Staten to be restrained, Dr. Hoem considered that Staten's prior self-harming behaviors had not been even potentially lethal, and that Staten did not present in a manner suggesting that he posed a serious risk of harm to himself.  No evidence of record suggests that Dr. Hoem had reason to believe otherwise, much less that Staten would have been able to harm himself severely with his typical, self-harming behaviors.  And no other medical professional disagreed with this assessment.  Finally, even though another psychologist temporarily placed Staten in restraints a few days later, there is no dispute that placement occurred after Staten's behavior escalated: he was holding his trap door open and threatening to harm himself with an object.

Staten submits multiple declarations in opposition, but none of his assertions reasonably dispute Dr. Hoem's uncontradicted, contemporaneous notes, the events that occurred after their interactions in September, or Dr. Hoem's recollection of their interactions.  Instead, Staten attests that Dr. Hoem said to another WSPF employee: "[W]e [are] not doing anything[,] Staten is not getting any fucking thing[,] tell Staten stop the bullshit[,] we will break him from this shit that [is] a promise."  (Dkt. #40.)  Staten claims that when he heard about these comments by Dr. Hoem, he continued to self-harm, but this statement by another WSPF official is inadmissible hearsay, not evidence admissible against Hoem.  In any event, Staten does not state when this comment occurred amidst the chain of events between September 20 and his release from clinical observation status.  Most importantly, even assuming Dr. Hoem made such unprofessional comments,

there is no evidence suggesting that when she made the comment, she knew Staten would learn about it, much less cause serious harm. With no evidence calling into question Dr. Hoem's decision to continue Staten's placement on clinical observation status without restraints, therefore, no reasonable jury could find her exercise of medical judgment was negligent, much less evidence of deliberate indifference.

### III. Wisconsin negligence

Finally, Dr. Hoem seeks summary judgment on Staten's state-law claim for his failure to satisfy Wisconsin's notice of claim requirements. Under Wis. Stat. § 893.82, a plaintiff must file a notice of claim with the Wisconsin Attorney General to commence an action under state law against a state officer, employee or agent within 120 days of the event causing injury. Wis. Stat. § 893.82(3). Moreover, the requirements of this statute must be "adhered to with exact care," *Newkirk v. Wis. Dep't of Trans.*, 228 Wis. 2d 830, 833, 598 N.W.2d 610 (Ct. App. 1999), and substantial compliance is insufficient, *Kellner v. Christian*, 197 Wis. 2d 183, 195, 539 N.W.2d 685 (1995). However, under Wis. Stat. § 893.82(5m), there is an exception to the notice of claim requirement for medical malpractice claims.

Although Staten submitted a notice of claim against Dr. Hoem, it was postmarked March 13, 2020. Because this notice was submitted well after the 120-day period lapsed, Staten's notice of claim was arguably untimely. Still, Staten has a non-frivolous argument that the notice of claim requirement does not apply in the first place due to the medical malpractice exception under § 893.82(5m).

14

"Medical malpractice" claims are claims of " 'negligent medical acts or decisions made in the course of rendering professional medical care.'" *Killian v. Nicholson*, No. 17-C-895, 2018 WL 1902587, at *3 (E.D. Wis. Apr. 20, 2018) (quoting *McEvoy v. Group Health Coop.*, 213 Wis. 2d 507, 530, 570 N.W.2d 397 (1997)). Dr. Hoem argues that because she is not a medical doctor, the medical malpractice exception to the notice of claim requirement does not apply, but she cites no authority for this proposition, and there is no question that she applied her expertise as a mental health professional in determining how to treat Staten.

Because the applicability of the medical malpractice exception is at least open to reasonable dispute, therefore, this court will relinquish supplemental jurisdiction over plaintiff's state-law claim. *See* 28 U.S.C. § 1367(c); *see Korzen v. Local Union 705*, 75 F.3d 285, 288-89 (7th Cir. 1996) ("The normal practice is to relinquish jurisdiction over a supplemental claim when the claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody."). Moreover, assuming Staten's claims are not otherwise time-barred, a state court is better equipped to address the possible application of § 893.82(5m) under these circumstances. Therefore, this claim will be dismissed without prejudice.

ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment (dkt. #34) is GRANTED as to plaintiff's Eighth Amendment claim against Dr. Hoem.

2. The court relinquishes jurisdiction over plaintiff's state-law claim against Dr. Hoem, which is DISMISSED without prejudice.

3. The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 29th day of March, 2023.

                              BY THE COURT:

                              /s/
                              _____
                              WILLIAM M. CONLEY
                              District Judge